

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA T.-E. AND RUFUS E., on their )
own behalf and as next friend for C.E., )
a minor child, *et al*, )
                          )
      Plaintiffs )
                          )     No. 05 C 473
                          )
         v. )     The Honorable William J. Hibbler
                          )
ROBERT SPERLIK, *et al* )
                          )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Tragically, a music teacher at several Berwyn, Illinois elementary schools, Robert Sperlik,

sexually abused a number of his female students during his career as a music teacher. The Plaintiffs,

many of Sperlik's victims and their parents[1], allege that school officials contributed to Sperlik's

abuse when they looked the other way or swept reports of Sperlik's abuse under the carpet. As a

result, the Plaintiffs have sued not only Sperlik and the South Berwyn School District (the District),

but also numerous school officials pursuant to 42 U.S.C. § 1983 and 20 U.S.C. § 1681 (Title IX of

the Educational Amendments of 1972). Plaintiffs also allege various state law claims. The

Defendants and the Plaintiffs each move for summary judgment.[2]

---

[1] When it is necessary to refer to the student-Plaintiffs or the parent-Plaintiffs individually, the Court will employ aliases in order to protect the student-Plaintiffs' privacy.

[2] Due to the complexity and length of the motions and the impending trial, the Court shall address the individual Defendants' arguments separately from the District's arguments and the Plaintiffs' arguments. A memorandum opinion and order on the remaining claims shall follow shortly.

I. Factual Background[3]

Robert Sperlik pleaded guilty multiple counts of aggravated kidnaping and aggravated criminal sexual abuse, which included the sexual abuse of a number of the student-Plaintiffs for his sexual gratification based upon his interest in bondage pornography. (Pl. St., Ex. 20). Unfortunately for everyone involved, Sperlik managed to cover up his crime for a number of years.

In May 2001, however, the District offered a program on personal safety presented by Pillars, a community-based counseling organization. (Def. District St. ¶ 45). Pillars presented the program at one of the elementary schools in Berwyn where Sperlik provided music instruction. (Def. District St. ¶ 46). After the program, two of the student-Plaintiffs, Jane Doe #2 and C.E., who were then in sixth grade, realized that some of the things that Sperlik had done to them during private instruction made them feel uncomfortable. (Def. District St. 47). Jane Doe #2 and C.E. wrote a letter to Mary Fick, the Pillars counselor who led the program. (Def. District St. ¶ 48).

The letter read:

Dear Mrs. Fick,

Jane Doe #2 and C.E. have a band teacher named Mr. Sperlik. When we are in band we feel very uncomfortable because he does the following:

Rubs our legs sometimes; Rubs our back to feel for a bra if we mess up and says it's ok; comments [to] me (C.E.) about my hair and how nice it looks when it's down; comments [to]

---

[3] The parties have file cross-motions for summary judgment. For convenience, the Court will simplify references to the record. The Court will identify references to Plaintiffs' 56.1(a)(3) Statement as (Pl. St.). References to Defendants' South Berwyn School District 100 and other individual Defendants'56.1(a)(3) Statement will be identified as (Def. District St.). References to Defendant Karen Uhren's 56.1(a)(3) Statement will be identified as (Def. Uhren St.). References to the Plaintiffs', the District's, and Uhren's 56.1(b)(3)(B) Statements will be identified as (Pl., Def. District, or Def. Uhren Resp). References to the Plaintiffs', the District's, and Uhren's 56.1(b)(3)(C) Statements will be identified as (Pl., Def. District, or Def. Uhren Add'l Facts). Finally, References to the Plaintiffs', the District's, and Uhren's replies to the opposing party's 56.1(b)(3)(B) Statements will be identified as (Pl., Def. District, or Def. Uhren Rep).

Jane Doe #2 about how she dresses [and] that she could be a model; there is another girl in our class and he doesn't do anything to her.

P.S. Please don't tell him we told you and if you do please don't mention any names!!! We're afraid to tell our parents!

(Pl. St. Ex. 13).

Fick forwarded the girls' letter to the school's principal, Karen Grindle. Grindle met briefly with Sperlik and allowed him to review the letter. (Pl. St. ¶ 91). After meeting with Sperlik, Grindle met with Jane Doe #2. (Pl. St. ¶ 92). Jane Doe #2 elaborated on what she and C.E. had told Fick in the letter. Specifically, Jane Doe #2 explained that when Sperlik rubbed their legs, he would touch their private areas through their clothes and that when he touched their backs he would pull them against him and press his penis into their backs. (Jane Doe # 2 Dep. at 154-55). Jane Doe # 2 also explained that Sperlik would feel their breasts. (Jane Doe #2 Dep. at 156). After Jane Doe # 2 met with Grindle, C.E. met with the Principal. C.E. also reported that Sperlik would touch the girls' private areas when he rubbed their legs and would feel their breasts when standing behind them. (C.E. Dep. at 214-217).

Shortly after meeting with the girls, Grindle met with the girls' parents. Grindle told Jane Doe #2's parents that their daughter had attended a "good touch/bad touch" seminar and overreacted to the presentation. (John Doe Dep. at 34-35). Grindle led Jane Doe #2's parents to believe that Sperlik had innocently touched their daughter on her shoulder and legs to teach them to hold a beat or to stop playing music. (John Doe Dep. at 35-36). Grindle also refused to show Jane Doe #2's parents the letter the girls had written. (John Doe Dep. at 34). C.E.'s mother reports a similar experience. Grindle told C.E. that her daughter complained that Sperlik had inappropriately touched her, but described the contents of C.E.'s complaints as "tapping" on C.E.'s knee to keep the beat.

3

(Sandra T.-E. Dep. at 104-117).  When C.E.'s mother became concerned, Grindle reassured her by stating that her own daughter had been abused and that Grindle would monitor the situation.  (Sandra T.-E. Dep. at 117-121).

After speaking with the girls and their parents, Grindle spoke with a social worker at the school, Nancy Ohalla.  (Def. District St. ¶ 72).  Grindle demonstrated to Ohalla the nature of the girls' complaints by placing her hand on her leg above her knee without moving it.  (Ohalla Dep. at 102).  Grindle did not show Ohalla the girls' letter or her own reports about the girls' complaints. Pl. St. ¶ 111).  Ohalla took no further action after speaking with Grindle.  (Pl. St.  ¶ 112).  In addition, Grindle claims that she told Karen Uhren about her meetings with the girls and their parents and that Uhren instructed Grindle to prepare an incident report.  (Def. District St. ¶ 71).

At some point, Grindle authored an undated incident report.  (Grindle Dep. Vol. 1, Ex. 3). In the report, Grindle described Sperlik's conduct as she had relayed it to the girls' parents.  (Grindle Dep. Vol. 1, Ex. 3).  Grindle also wrote a memorandum to Sperlik, informing him of the complaints "that could be considered sexual harassment."  (Grindle Dep. Vol. 1, Ex. 4).  The memorandum advised Sperlik not to make physical contact with students and to refrain from comments regarding students' appearance.  (Grindle Dep. Vol. 1, Ex. 4).  Grindle did not date either of these documents and did not write either of them on school letterhead.  Further, Grindle imposed no discipline upon Sperlik, other than the memorandum that she wrote to him.

Despite the reports regarding his behavior from C.E. and Jane Doe #2, Sperlik continued to abuse his students.  During the 2001-2002 school year, M.K. took band classes from Sperlik.  (Def. District St. ¶ 84).  In January 2002, M.K.'s mother, Deborah K., learned that Sperlik had taken her daughter by the arm during a band lesson.  (Def. District St. ¶ 86).  Grindle met with M.K. and M.K.

explained that Sperlik had forcefully grabbed her arms to restrain her. (M.K. Dep. at 50, 63-67).

Grindle met with Sperlik, and informed M.K. that Sperlik would no longer be allowed to teach with

his classroom doors closed. (M.K. Dep. at 72-76). M.K. and her mother did not feel that Grindle

had acted sufficiently, and so met with the school's social worker, Cindy Schwartz. (M.K. Dep. at

82-84). M.K. told Schwartz that Sperlik was hurting her and Schwartz told her that she would talk

to Grindle further. (M.K. Dep. at 86-88). Even after a second complaint against Sperlik in less than

a year, Grindle did not alert other school personnel to Sperlik's ongoing behavior or discipline

Sperlik in any way other than instructing him not to touch his students. Sperlik admitted in his

criminal plea that he restrained his students for his sexual gratification. (Pl. St., Ex. 20).

In April 2002, Grindle received an anonymous complaint from a parent who complained that

Sperlik made her daughter uncomfortable putting his fingers over the daughter's during band class.

(Def. District St. ¶ 99). Grindle informed the District's Superintendent, William Jordan, about the

call. (Def. District St. ¶ 100). At the same time, Grindle informed Jordan of C.E.'s and Jane Doe

# 2's complaints against Sperlik from the prior year, but presented them as a pedagogical issue. (Pl.

St. ¶ 141). Jordan instructed Grindle and Mary Lee Bocwinski, the District's Director of Curriculum,

to address Sperlik's teaching methods. (Def. District St. ¶¶ 100-101). Grindle did not inform

Bocwinski of the contents of C.E.'s and Jane Doe #2's letter, but instead told her that there had been

an "incident" with Sperlik last year that had been resolved to everyone's satisfaction. (Bocwinski

Dep. at 57-65, 93). Grindle and Bocwinski addressed the anonymous complaint as a teaching

methods issue and not as a sexual harassment issue. (Def. District St. ¶¶ 106-107).

Another student, A.T., told a social worker, Carol Albores, that Sperlik had taped her to a

chair with duct tape, touched her thighs and her shoulder, which had made her uncomfortable. (A.T.

Dep. at 57-68). A.T. told Albores about Sperlik's abuse after Albores had discussed with A.T. the story of a girl who had been molested by her father. (A.T. Dep. at 72). A.T. also told Albores that a friend's father had sexually abused her. (A.T. Dep. at 72). Albores told A.T. that A.T. could tell the principal about Sperlik's behavior or offered to tell the principal herself. (Pl. St. ¶ 122). Albores confronted Sperlik and told him that A.T. did not like him touching her shoulder; Sperlik thanked Albores for coming to tell him. (Albores Dep. at 75). Shortly after speaking with Albores, A.T. dropped out of band. (A.T. Dep. at 90). Albores did not submit any written documentation regarding A.T.'s complaints regarding Sperlik and did not investigate whether any other students had complained about his behavior. (Pl. St. ¶ 125). Albores informed the school's principal, Charles Kaiser, about A.T.'s complaints, but Kaiser did not interpret them as complaints about sexual harassment or inappropriate touching. (Albores Dep. at 67-69; Pl. St. ¶ 126; Def. District St. ¶ 116).

In January 2005, C.E. told her mother that Sperlik used to bind her with duct tape during band class. (Def. District St. ¶ 123). Sandra T.-E. reported Sperlik's behavior to the Berwyn Police., who launched a criminal investigation and shortly thereafter arrested Sperlik (Def. District St. ¶¶ 125, 128). As a result of Sperlik's arrest, other of his victims were identified, including T.A., Jane Roe, R.A., K.B., G.G., A.S., and R.B. Each of these students reported that Sperlik bound them with duct tape (usually presented by Sperlik in the form of a "game"), several reported that he rubbed their thighs, and many reported that he touched their breasts.

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. Fed.R.Civ.P. 56(c). Once the moving party has met the initial burden, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir.2005). During the Court's review, it must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

### III. Discussion

#### A.    Fourth Amendment Claim

The Plaintiffs allege that the Defendants violated their Fourth Amendment rights in Count I. The individual Defendants, but for Sperlik, move for summary judgment, arguing that the Plaintiffs cannot establish that the individual Defendants were personally involved in the deprivation of their rights.

Liability under § 1983 requires proof that the conduct complained of was committed by a person acting under the color of the law and that it deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Yang v. Hardin*, 37 F.3d 282, 284 (7th Cir. 1994). Generally, section 1983 does not allow actions against individuals merely

because of their supervisory authority, but instead requires that a defendant cause the deprivation at issue. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). Omissions, however, may violate civil rights, and under certain circumstances, a state actor's failure to intervene to prevent another's Fourth Amendment violation renders her culpable under § 1983. *Yang*, 37 F.3d at 285 (collecting cases). The Plaintiffs argue, under this theory, the individual Defendants' failure to prevent Sperlik's abuse renders them liable under § 1983 for Fourth Amendment violations committed by Sperlik.

Most frequently, a state actor's failure to intervene arises in the context of excessive force actions brought against police officers. When a police officer, who is *present* and fails to intervene to prevent a fellow officer from depriving a citizen of his constitutional rights, the officer can be liable if he had reason to know that excessive force was being used (or any other constitutional violation was being committed) and if he had a reasonable opportunity to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005); *Yang*, 37 F.3d at 285; *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). In *Yang*, for example, a police officer shoplifted from the store owned by a plaintiff that had just been burglarized. 37 F.3d at 283. When the store owner confronted the police officer, the officer shoved him and attempted to flee the scene. *Id.* at 283-84. The store owner attempted to prevent the officer from leaving by hanging onto the squad car's door, but the police officer drove away quickly and recklessly, zig-zagging, accelerating and decelerating. *Id.* Ultimately, when the car stopped, the officer punched the store owner in the face. *Id.* The police officer's partner, throughout the criminal endeavor, sat silently in the passenger seat of the squad car doing nothing. *Id.* The Seventh Circuit held that the partner could have called for

backup, called for help, or cautioned the other officer to stop, and that his failure to take any preventative measure rendered him liable for his partner's use of excessive force. *Id.* at 284-85.

The Plaintiffs point to C.E.'s and Jane Doe #2's testimony that they informed Grindle of the details of Sperlik's abuse and that, armed with that knowledge, she could have prevented other students from being abused by taking steps to remove Sperlik from his position. The Plaintiffs point to other facts to charge other individual Defendants' with knowledge of Sperlik's activity. Whether the Defendants had knowledge of Sperlik's *prior* violations of the student-Plaintiffs' constitutional rights is not, however, the relevant inquiry. Under *Brishke, Yang*, and their progeny, a state actor may be liable if he or she fails to intervene in an imminent or ongoing constitutional violation. The failure-to-intervene doctrine does not, however, impose liability upon state actors for failing to prevent (or predict) constitutional violations that may occur some time in the future. *See Harris v. Clark*, 06 C 529, 2008 WL 4866680, * 7 (E.D. Wis. Nov. 10, 2008).

In *Harris*, two police officers arrested the plaintiff, and according to the plaintiff, one of the two was "abusive from the start." The plaintiff claimed that the abuse began during the arrest and escalated after the officers escorted him to the police station, where the plaintiff suffered an injury at the hands of only one of the two officers. *Id.* at *2-3. The plaintiff argued that the officer who did not actually cause the injury should have inferred from his partner's use of excessive force during the arrest that he might be likely to use excessive force again in the future. *Id.* at *6. The court reasoned that the most the plaintiff had shown was that the officer was aware of "a *risk* that [his partner] might use excessive force on [the plaintiff] again at some point." *Id.* at *7. The court refused to extend the failure-to-intervene doctrine to situations where an officer disregards a risk that a state actor may violate a citizen's constitutional rights in the future. *Id.* at 7.

9

Sperlik's future conduct is even more attenuated from the knowledge of his past conduct than the conduct at issue in *Harris*. In *Harris*, the officer had seen his partner use excessive force just minutes ago and knew also that his partner was about to take the plaintiff to a secluded location. Here, the Plaintiffs at most have demonstrated that Grindle (and possibly other school officials) knew that Sperlik had abused C.E. and Jane Doe #2. Based on this knowledge, Plaintiffs want to hold the individual Defendants liable for any and all future Fourth Amendment violations that Sperlik committed because, they argue, the individual Defendants could have intervened to prevent future abuse. Plaintiffs hint that the individual Defendants' training as mandated reporters, social workers, or educators should have given them reason to suspect Sperlik would continue to abuse other students. Merely because the individual Defendants knew that Sperlik had committed past violations of his students' constitutional rights does not mean that they *knew* that he would commit future violations of different students' rights. Perhaps they *should have known* that Sperlik would continue abusing his students, but negligent omission is insufficient to support a failure-to-intervene claim. That the school officials did not act more decisively did indeed have tragic consequences, but that failure does not transform their negligence into a Fourth Amendment violation.

The Court grants the individual Defendants, but for Sperlik, summary judgment on Count I of Plaintiffs' Complaint.[4]

B.      *Substantive Due Process Claim*

---

[4] The Plaintiffs also argue that their Fourth Amendment claims against the individual Defendants survive because the individual Defendants conspired to violate the Plaintiffs' Fourth Amendment rights. There simply is no evidence in the record from which a reasonable juror could conclude that any of the individual Defendants conspired with Sperlik to violate the girls' Fourth Amendment rights. That the individual Defendants could have done more to prevent Sperlik from abusing the student-Plaintiffs does not suggest that the individual Defendants actually had an agreement with Sperlik to violate the student-Plaintiffs' Fourth Amendment rights.

10

The Plaintiffs next claim that the individual Defendants violated their substantive due process rights under the Fourteenth Amendment. The Plaintiffs argue that the sexual abuse of a school child at the hands of her teacher both shocks the conscience and violates the child's right to bodily integrity. It goes without saying that the sexual molestation of a student violates that student's substantive due process rights. None of the individual Defendants except for Sperlik, however, actually sexually molested the students. The Plaintiffs instead suggest that when school officials turn a blind eye and acquiesce to a teacher's molestation of his students that acquiescence, in turn, violates the students' substantive due process rights.

Generally, the state (including its local governmental entities and their agents) does not have a due process obligation to protect its citizens from the abuses of other private citizens. *See DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S 189, 195-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The due process clause is not "a guarantee of certain minimal levels of safety and security." *Id.* at 195. Where the state, however, has a special relationship with a person, such as when it takes a person into custody, or where it creates a danger to a person, it then has an affirmative duty to provide for a person's safety. *Id.* at 198-201. The Seventh Circuit has explicitly rejected the notion that students are persons with whom the state has a "special relationship" and owes an affirmative duty to protect. *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990); *Nabozny v. Podlesny*, 92 F.3d 446, 459 (7th Cir. 1996).

The Plaintiffs attempt to distinguish *J.O.* by arguing that where school officials turn a blind eye to sexual molestation of its students — either by discouraging the reporting of abuse or by allowing it to continue unpunished — that they have encouraged a climate to flourish where innocent

11

children can be victimized. In support, they rely on a *Stoneking v. Bradford Area Sch. Dist.*, a third Circuit decision.

In *Stoneking*, the court observed that public officials could not be liable for a mere failure to supervise. *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 730 (3rd Cir. 1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Nonetheless, the court held that public officials could not continue a policy or practice that condoned or authorized unconstitutional behavior. *Id.* The court observed that two school officials had discouraged and minimized sexual misconduct by teachers, which encouraged a climate where students were victimized. *Id.*

The Seventh Circuit has neither explicitly adopted nor explicitly rejected the holding in *Stoneking*. In *J.O.*, the Seventh Circuit observed that the plaintiff had not pleaded the school defendants had "promoted school policies that 'encourag[ed] a climate to flourish where innocent [children] were victimized.'" *J.O.*, 909 F.2d at 271-72 (quoting *Stoneking*, 882 F.2d at 730); *see also Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1016 n.4 (7th Cir. 1995) (expressing no opinion regarding *Stoneking*'s theory of constitutional liability).[5] Several courts in this district have held that *J.O.*'s treatment of *Stoneking* amounts to an implicit acceptance of its theory of constitutional liability. *See, e.g., Doe v. Bd. of Educ. Of Consol. Sch. Dist. 230 Cook County, Il.*, 18

---

[5] The Seventh Circuit has rejected a claim that school officials who failed to discipline students for harassing a homosexual student promoted a policy that allowed a climate where constitutional violations flourished. *Nabozny*, 92 F.3d at 460. *Nabozny* is distinct from *J.O.* and this case in that the plaintiff in *Nabozny* was victimized by another student, and not a state actor, placing it squarely within the holding of *DeShaney*. *See Doe v. Riverside-Brookfield Tp. High Sch. Dist. 208*, 95 C 2437, 1995 WL 680749, * 4-5 (N.D. Ill. Nov. 14, 1995) (refusing to extend *Stoneking* theory to situation where student harmed by private actor);*Thames*, 1991 WL 86037, * 3 (distinguishing *Stoneking* claims brought against teachers and from those brought against students and emphasizing *DeShaney's* restriction of *due process* claims alleging failure to protect an individual against private violence).

F.Supp.2d 954, 959 (N.D. Ill. 1998); *Doe by and through Doe v. Evanston Tp. Sch. Dist. 202*, 93 C

1011, 1994 WL 55652, * 1-2 (N.D. Ill. Feb. 23, 1994); *Doe v. Bd. of Educ. Of Hononegah*

*Community High Sch. Dist. #207*, 833 F.Supp. 1366, 1377-78 (N.D. Ill. 1993); *Thames v.*

*Kimbrough*, 91 C 600, 1991 WL 86037, * 3 (N.D. Ill. May 15, 1991). The Court joins the other

courts in this district in adopting the reasoning in *Stoneking*, tacitly approved in *J.O.* A substantive

due process claim can stand where the plaintiff puts forth enough evidence to demonstrate that an

individual defendant turned a blind eye to constitutional violations thereby allowing a climate to

flourish where innocent students are victimized. As these courts have noted, this requires something

more than a mere failure to investigate.

Here, there are allegations that Grindle turned a blind eye to Sperlik's abuse of his students.

First, Grindle provided the parents of two of the girls a watered-down version of their allegations

and, according to the parents, refused to let them see the letter the girls wrote to Fick. C.E. and Jane

Doe #2 allegedly told Grindle that Sperlik was pressing his penis against their back, feeling their

breasts, and rubbing the insides of their legs. But rather than report these allegations to the girls'

parents, the parent-Plaintiffs allege that Grindle told the parents that their daughters had overreacted

to a good touch/bad touch seminar and led them to believe that Sperlik's touching of their daughters

had some pedagogical purpose. Whether Grindle provided this explanation because it was all the

information she had at the time or whether she purposefully withheld details of the girls' allegations

because she did not want to become embroiled in a scandal is a question for a jury to decide and not

the court. It suffices that it provides evidence from which a jury might infer that Grindle lied to the

parents of two of Sperlik's victims. Moreover, even though the record contains evidence that Grindle

advised the parents to speak to their daughters, that conversation takes a much different tone if it

begins with a question about a teacher touching a student to keep the beat than if it begins with a question about a teacher touching a student for a sexual purpose.

In addition, there is substantial evidence from which a jury might infer that Grindle swept the incident under the rug. For example, the Plaintiffs point to evidence that Grindle lied not only to C.E.'s and Jane Doe #2's parents about the nature of the girls' allegations, but also that she lied to other school district employees, including the school social worker Ohalla and Director of Human Resources Karen Uhren. Similarly, the record contains evidence from which a jury might infer that Grindle failed to communicate the girls' allegations to other persons in the District. Karen Uhren claims that Grindle never spoke to her about C.E.'s and Jane Doe #2's allegations. The memorandum written by Grindle to Sperlik is undated and not written on school letterhead, raising questions about when Grindle actually created it. Grindle did not show the girls' letter to the school Superintendent. In short, if a jury believes C.E.'s and Jane Doe # 2's testimony that they told Grindle the complete details of Sperlik's lurid behavior, the jury could easily conclude that Grindle's failure to alert even one person in the district of the presence of a potential pedophile implicitly condoned Sperlik's behavior.

Finally, the Plaintiffs point to evidence that Grindle received multiple complaints about Sperlik and never once provided him anything more than the flimsiest of warnings. Instead of providing any meaningful consequence for Sperlik's repeated abuse of his students, Grindle merely instructed him to stop doing it. Further, the Plaintiffs point to evidence that Grindle allowed Sperlik to continue teaching small numbers of students in isolated and secluded spaces.

The Court must view the facts in the light most favorable to the Plaintiffs, which requires it to credit C.E.'s and Jane Doe #2's testimony that they told Grindle the complete details of Sperlik's

14

abuse. Given this conclusion and the minimal response to the girls' allegations, a jury could infer from Grindle's response that she turned a blind eye to Sperlik's flagrant sexual molestation, allowing it to fester. A reasonable jury could further conclude that Grindle's decision to sweep the allegations under the rug sent an implicit message to Sperlik that despite criminal behavior and multiple complaints against him, Grindle would do nothing to report his misconduct to other persons within the district or otherwise punish him but would instead help him to conceal it. The Court holds that Plaintiffs have put forward sufficient evidence to state a claim under the *Stoneking* theory that Grindle's tacit approval of Sperlik's conduct allowed a climate to flourish where Sperlik was able to cause harm to the student-Plaintiffs. Accordingly, the Court DENIES her motion for summary judgment on Count II.

With regard to the other individual Defendants, the evidence in the record is far more sparse. The Plaintiffs argue that there is "plenty of affirmative evidence to support this claim against all Defendants on notice of Sperlik's abuse." But the Plaintiffs wholly fail to explain even one piece of affirmative evidence in support of the claim against other individual Defendants.

The Plaintiffs might point to the fact that Grindle told Uhren and Ohalla about C.E.'s and Jane Doe #2's allegations. But in the Plaintiffs' version of events, Grindle told Uhren and Ohalla the same watered-down version of events that she told the girls' parents. (Pl. St. ¶¶ 108-09, 111, 114-115, 117). Similarly, the Plaintiffs point to evidence to suggest that Grindle did not inform Bocwinski of prior complaints against Sperlik when the two of them created instructional guidelines for Sperlik to follow. (Pl. St. ¶¶ 140-145). The Plaintiffs also suggest that Grindle did not inform Superintendent Jordan of the potentially sexual nature of the 2002 complaint against Sperlik, but instead presented it as an instructional issue. (Pl. St. ¶¶ 108-117; 140-145). If Grindle were

consistently sweeping the allegations against Sperlik under the rug, then Uhren, Ohalla, Bocwinski, and Jordan had no reason to believe an investigation was warranted. In short, under the Plaintiffs' version of events, it cannot be said that these Defendants turned a blind-eye to Sperlik's behavior, but instead were blinded by Grindle's presentation of that behavior.

Neither did Albores turn a blind-eye to Sperlik's behavior. When A.T. complained that Sperlik duct-taped her and touched her inappropriately, Albores confronted Sperlik and reported A.T.'s allegations to the school's principal, Kaiser.

The Plaintiffs fail to develop any argument that any individual Defendant other than Grindle turned a blind-eye to Sperlik's abuse. The Court GRANTS summary judgment to all individual Defendants but for Grindle and Sperlik on Count II of the Plaintiffs' Complaint.

## C.   Equal Protection Claim

The Defendants argue that Plaintiffs' equal protection claim cannot survive their summary judgment motion because the Plaintiffs cannot point to any evidence that the Defendants denied protection to Sperlik's female students that it offered to his male students. In short, the Defendants argue that the Plaintiffs cannot show that they acted with any discriminatory intent.

The Equal Protection Clause prohibits the state from "selectively deny[ing] its protective services to certain disfavored minorities." *Deshaney*, 489 U.S. at 197 n.3, 109 S.Ct. at 1004 n.3. In pressing such a claim, a plaintiff must demonstrate that the defendant "acted with a nefarious discriminatory purpose." *Nabozny*, 92 F.2d at 453. The law, however, is not so narrow as to require a plaintiff who pursues an equal protection claim to prove an intentional discriminatory act, for it is rare that a person will announce the motive behind his act. *See. Seiwert v. Spencer-Owen Community*

*Sch. Corp.*, 497 F.Supp.2d 942, 952 (S.D. Ind. 2007). Instead, a plaintiff must demonstrate that a defendant acted either intentionally or with deliberate indifference. *Nabozny*, 92 F.3d at 454.

The individual Defendants argue that it was Sperlik, not them, who violated the Equal Protection Clause's mandate. Under § 1983, however, supervisory liability can be established if the conduct causing the deprivation occurred with the supervisor's knowledge and consent. *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005); *Nabozny*, 92 F.2d at 453 (a state actor may not turn a blind-eye to the Clause's command). A supervisor who knows about conduct that violates the Equal Protection Clause may not turn a blind eye for fear of what she may see. *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988); *see also Brogato v. Proviso Township Mental Health Commission*, N. 04 C 7493, 2008 WL 904775, * 4 (N.D. Ill. Mar. 31, 2008).

Indisputably, Sperlik's abuse of his female students violates the Equal Protection Clause. Time after time, he groomed his female students. He complimented their appearance and dress, comparing them to models. He presented his initial advances as "games." If sexual harassment in the workplace violates the Equal Protection Clause, then certainly the sexual abuse of female students by a teacher violates the Equal Protection Clause. Thus, any of Sperlik's supervisors who knew about his conduct and who turned a blind eye to that conduct also violated the Equal Protection Clause.

As discussed above, the Plaintiffs have put substantial evidence that Grindle turned a blind eye to Sperlik's abuse. No less than four students brought Sperlik's advances to her attention. The record contains evidence that two of these four students told Grindle that Sperlik felt their breasts, among other things. Viewed in the light most favorable to the Plaintiffs, the record shows that despite this knowledge, Grindle not only failed to take any action designed to prevent Sperlik from future

17

abuse, but actively concealed the true nature of Sperlik's behavior from the students' parents and also from other school administrators and personnel. The Court finds that a reasonable jury could find that Grindle acted with deliberate indifference to the student-Plaintiffs' complaints that Sperlik sexually abused them. The Court DENIES Grindle's motion for summary judgment on Count IV.

As for the other individual Defendants, several of them cannot possibly be described as Sperlik's supervisors, including Ohalla, Schwartz, and Albores, and so the cannot be liable under a theory of supervisory liability. As noted in Section III.B above, the other individual Defendants did not so much as turn a blind eye to Sperlik's behavior but instead were blinded by Grindle's presentation of events. The Court GRANTS summary judgment on Count IV for all individual Defendants but for Sperlik and Grindle.

## D.   Intentional Inflection of Emotional Distress Claim

Under Illinois law, a plaintiff must meet three requirements to support a claim for intentional infliction of emotional distress: 1) the defendant's conduct is extreme and outrageous; 2) the actor intends the conduct to cause severe emotional distress or knows there is a high probability it will inflict such distress; and 3) the conduct must in fact cause such distress. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008).

The individual Defendants first argue that most of the individual Defendants had little notice of Sperlik's actual behavior. Defendants suggest that only Grindle, Albores, Schwartz, and Kitzberger had any first-hand knowledge of Complaints from the students. Without knowledge of Sperlik's behavior that allegedly caused the distress, the Defendants argue that they cannot have intentionally inflicted emotional distress, pointing to *Campbell v. A.C. Equipment Services Corp.*, 242 Ill. App. 3d 707 (Ill. App. Ct. 1993), in support. Plaintiffs do not dispute this general principal,

but instead suggest that all of the individual Defendants learned of the "lurid details of Sperlik's abuse" and "refused to take any meaningful actions to protect his students form future abuse."

The Court need not restate all of the facts, most presented by the Plaintiffs themselves, that demonstrate that Grindle did not share the full version of C.E.'s and Jane Doe #2's complaints about Sperlik. It suffices to say that none of the individual Defendants but for Grindle possessed a complete picture of Sperlik's behavior. Armed with full knowledge of the allegations against Sperlik, it is easy to connect the dots that demonstrate the "lurid details of Sperlik's abuse." But under Plaintiffs' own version of the facts, the only individual Defendant who knew of each of the "dots" was Grindle.

Even those Defendants who received direct complaints from students did not have complete knowledge of Sperlik's behavior. Kitzberger, for example, received a report that Sperlik had placed duct tape over the mouth of one student for excessive talking. (Pl. St. ¶ 81). With the benefit of hindsight, Sperlik's treatment of A.M. certainly appears to be part of Sperlik's ongoing pattern of abusing his students. But Kitzberger knew only that Sperlik disciplined a student for excessive talking by placing duct tape on her mouth. Without more, this incident appears to be little more than a problem with an overzealous disciplinarian.

Other individual Defendants had more complete knowledge, but did in fact act upon that knowledge. Plaintiffs themselves suggest that Albores did in fact respond to the A.T.'s complaint, confronting both Sperlik and informing the school's principal. (Pl. St. ¶ 126). Similarly, when M.K. complained to Schwartz about Grindle's failure to discipline Sperlik, Schwartz informed M.K. that she would talk to Grindle, and Grindle assured her that she was handling the situation. (Pl. St. ¶ 137).

Because the individual Defendants but for Grindle either had incomplete knowledge or acted upon the knowledge that they did possess, the Court holds that no reasonable jury could find that any of the individual Defendants intended to cause the Plaintiffs' severe emotional distress. The Court GRANTS summary judgment on Count IX to all individual Defendants but for Grindle and Sperlik.

As with the previous claims, Defendant Grindle's motion for summary judgment on Count IX requires further discussion. Grindle points out that she advised the parents to talk to their students. But if Grindle misled parents into believing that Sperlik's behavior was relatively innocuous, as the evidence viewed in a light favorable to the Plaintiffs shows, then it is more than reasonable to conclude that the parents may not have seen a need to do so. Grindle also suggests that because band class was voluntary that she could not have known that her response to Sperlik's behavior would cause the students severe emotional distress — for they were always free to quit band. This argument, however, minimizes both the consequences of Sperlik's abuse (including, but not limited to his victims coming to distrust authority figures or music teachers) and Grindle's response to it. The girls were ten, eleven, or twelve when Sperlik abused them. For some time, they failed to understand the nature of the abuse, and did not begin to understand it until a the school offered a presentation on sexual abuse. The fact that they could choose not to go to band class does not mitigate Grindle's failure to respond to Sperlik's criminal behavior or her decision to cover up that behavior.

If the jury believes the Plaintiffs' version of events, Grindle knew that Sperlik was grooming young girls for abuse and then sexually abusing them, and despite this knowledge she lied to the girls' parents about Sperlik's behavior and withheld information from other school officials who

might have put an end to Sperlik's behavior. The Court is hard-pressed to imagine behavior a jury would be more likely to label as "extreme and outrageous."

In addition, there is ample evidence to demonstrate that Grindle knew that covering up Sperlik's behavior would have a high probability of causing emotional distress. The District provides training for its staff in recognizing sexual harassment and its consequences. (Def. Dist. St. ¶¶ 222-225). Grindle assuaged C.E.'s mother's fears by commenting on the sexual abuse of her own daughter. Clearly a jury could conclude that Grindle understood the severe emotional consequences associated with sexual abuse. Moreover, after receiving multiple complaints, Grindle also knew that Sperlik was continuing to abuse students even after she spoke with him following C.E.'s and Jane Doe #2's complaint. A jury could further conclude that she knew there existed a high probability that other students would experience such distress if she did not shine a spotlight on Sperlik's behavior.

Finally, Grindle argues that the student-Plaintiffs did not actually suffer severe emotional distress. In support, Grindle argues that the students who complained to her did not return to Sperlik's class and suffered no further abuse. But the effects of Grindle's decision to turn a blind eye to Sperlik's behavior cannot be so limited. Evidence in the record suggests that several of these students testified that they have difficulty trusting authority figures: in part, perhaps, because Grindle did not protect them. Moreover, had Grindle shared the full extent of the girls' complaints with their parents, then the girls in all likelihood would have begun the recovery process from Sperlik's abuse three years prior to when they actually began it. Finally, had Grindle acted upon C.E.'s and Jane Doe #2's complaints, it is highly likely that none of the other student-Plaintiffs, but for R.A., would have suffered any abuse.[6]

---

[6] For these same reasons, the Court DENIES Grindle's Motion for summary judgment on all claims related to C.E., Jane Doe #2, A.T., and R.A.

Grindle next argues that none of the parent-Plaintiffs can maintain a cause of action under Illinois law for the emotional distress suffered by their children. Under Illinois law, parents do not have a primary cause of action for injuries inflicted upon their children. *Doe v. Montessori Sch. Of Lake Forest*, 289 Ill. App. 3d 289, 301 (Ill. App. Ct. 1997). Thus, the parent-Plaintiffs cannot recover for the emotional distress caused by "the knowledge that their young daughters were subjected to abuse." (Fourth Am. Compl. ¶ 114); *Montessori Sch. Of Lake Forest*, 289 Ill. App. 3d at 301-02. At the same time, the parents do have an independent cause of action for any medical treatment or expenses caused by a defendant's tortious conduct towards a child. *Id.* The parent-Plaintiffs do claim that they have sustained medical and psychological expenses, and to the extent those expenses are caused by any of the Defendants' tortious conduct towards the children, the parent-Plaintiffs may recover those expenses.

The Court DENIES Grindle's motion for summary judgment on Count IX. The Court further GRANTS Grindle's motion for summary judgment on Count IX with regard to the parent-Plaintiffs to the extent that the parent-Plaintiffs claim emotional distress that is derivative of the emotional distress inflicted upon their children. The Court DENIES the Grindle's motion for summary judgment on Count IX with regard to the parent-Plaintiffs to the extent that the parent-Plaintiffs seek medical and psychological expenses attributable to the emotional distress inflicted upon their children.

E.    *Qualified Immunity*

Most of the individual Defendants make an argument that qualified immunity protects them from liability, arguing that the information they received was so second-hand as that the alleged right they violated could not have been clearly established. This argument, plainly does not apply to

Grindle, who instead argues that she is immune because it was not clearly established that she had an obligation to stop Sperlik's abuse. The Court disagrees. The law imposing liability on supervisors who condone constitutional violations by turning a blind-eye was clearly established at the time of Grindle's alleged constitutional violations. Similarly sufficient courts in this district had adopted the *Stoneking* theory, in reliance upon language in *J.O.*, that this law also was clearly established.

Grindle next argues that the "degree of her response" to Sperlik's behavior requires a balancing of many factors, including the accuracy of information, Sperlik's response, the effect of a memorandum directed at him. Grindle reasons that because her response to Sperlik's behavior requires the exercise of discretion, that it cannot possibly be in violation of clearly established law. This argument, however, depends on an interpretation of the facts in a light other than that most favorable to the Plaintiffs. It is clear beyond doubt that when multiple students come forward with an allegation that a teacher has sexually abused them that it is not an appropriate response to lie to the students' parents about the nature of the allegations and to fail to take any action to deter the ongoing sexual abuse. The Court DENIES Grindle's argument that she is entitled to qualified immunity.

IT IS SO ORDERED.


7/23/09
Dated

Hon. William J. Hibbler
United States District Court

23